# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Aug 16 2017, 8:56 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Timothy E. Stucky
Stucky, Lauer & Young, LLP
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Kyle Hunter
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Involuntary Termination of the Parent-Child Relationship of S.C. (Minor Child) and<br><br>T.M. (Mother),<br><br>*Appellant-Respondent,*<br><br>v.<br><br>The Indiana Department of Child Services,<br><br>*Appellee-Petitioner* | August 16, 2017<br><br>Court of Appeals Case No. 02A05-1703-JT-471<br><br>Appeal from the Allen Superior Court<br><br>The Honorable Charles F. Pratt, Judge<br><br>The Honorable Sherry A. Hartzler, Magistrate<br><br>Trial Court Cause No. 02D08-1604-JT-79 |

**Crone, Judge.**

## Case Summary

T.M. ("Mother") appeals the involuntary termination of her parental rights ("the Termination Order") to her child, S.C. ("Child"). Mother argues that the trial court clearly erred in concluding that there is a reasonable probability that the conditions that resulted in Child's removal from Mother's care or the reasons for placement outside Mother's home will not be remedied. She also argues that the trial court clearly erred in concluding that termination of the parent-child relationship was in Child's best interests and that adoption was a satisfactory plan for Child care and treatment. Finding no error, we affirm.

## Facts and Procedural History

The facts most favorable to the Termination Order show that in July 2005, Mother married M.M. ("Stepfather"). In September 2005, Mother gave birth to Child. Child's biological father is L.B., but he is not participating in this appeal.[1]

In November 2014, the Indiana Department of Child Services ("DCS") removed Child from Mother and Stepfather's home because Child had been missing numerous days of school and Mother was struggling with mental health and substance abuse issues and had engaged in domestic altercations with Stepfather in Child's presence. Appealed Order at 2. The trial court authorized

---

[1] L.B. has continuously resided in Florida, has not interacted with Child, and voluntarily relinquished his parental rights. Although Stepfather was a party to the CHINS proceedings, he has made no legal claim of parentage to Child.

DCS to file a petition alleging that Child was a child in need of services ("CHINS") and placed Child in foster care.

[4] Following a hearing, in February 2015, the trial court adjudicated Child a CHINS based on Mother's, Father's, and Stepfather's admissions to certain allegations in the amended CHINS petition.[2] *Id*. Specifically, Mother admitted that Child had been late to school nine times between October 1, 2014, and November 6, 2014; she had left Child with Stepfather for two to three days at a time; she had mental health issues and had recently undergone inpatient treatment at Parkview Behavior Health Clinic but had stopped taking her medication; and she had issues with drug abuse and refused to submit to an oral swab drug test in November 2014 as requested by DCS. Appealed Order at 2; Appellant's App. Vol. 2 at 25 (amended CHINS petition). Stepfather admitted that Mother had issues taking her prescriptions as prescribed and had made threats to kill herself. By the time of this hearing, Mother had moved out of the home that she had shared with Stepfather. The trial court approved placement of Child in Stepfather's home under DCS's supervision and granted Mother supervised visitation. Appellant's App. Vol. 2 at 39.

---

[2] We note that the copy of the amended CHINS petition in the record contains handwritten notations indicating Mother's and Stepfather's admissions and denials next to the allegations and handwritten alterations of some portions of some of the allegations. Appellant's App. Vol. 2 at 25-27. The Appealed Order's description of Mother's and Stepfather's admissions is consistent with the handwritten notations and alterations. Appealed Order at 2. DCS's description of Child's removal from Mother's care and custody would be consistent with the amended CHINS petition if it did not have the handwritten alterations, but it is not entirely consistent with the Appealed Order. Appellee's Br. at 10-11. We provide Mother's and Stepfather's admissions as set forth in the Appealed Order.

[5]     The trial court issued a dispositional order, in which it required Mother and Stepfather to comply with a parent participation plan ("PPP"). Mother was required to do the following: refrain from criminal activity; maintain clean, safe, and appropriate housing; notify DCS of changes in housing and employment; cooperate with all caseworkers, the guardian ad litem ("GAL"), and the court appointed special advocate ("CASA"); attend all case conferences and maintain contact with DCS; submit to a diagnostic assessment and follow all recommendations; obtain a drug and alcohol assessment and follow all recommendations; successfully complete drug and alcohol counseling, individual counseling, and parenting classes; submit to random drug screens and refrain from alcohol, illegal drugs, and other substance abuse; and attend and appropriately participate in all visits with Child.

[6]     Mother initially complied with the PPP. She cooperated with service providers and submitted to a diagnostic assessment. She completed the drug and alcohol counseling program and submitted to all drug tests, and her drug screenings came back negative. She completed two parenting programs. Mother attended all scheduled visitations with Child. In April 2015, Mother moved into an apartment and DCS began conducting visitations there. Also in April, Mother began attending individual therapy. In May 2015, the trial court authorized a permanency plan calling for Child's reunification with Mother.

[7]     In June 2015, Mother stopped attending individual therapy sessions, after having attended only four sessions. Her therapist had been unable to establish a treatment plan and reported that Mother lacked insight into her issues and

thought that the only problem was DCS's involvement. In mid-July 2015, Mother abruptly stopped attending visitation with Child. Twice at the end of July, a DCS family case manager brought Child to Mother's apartment for scheduled visits, but Mother was not there. Attempts to contact Mother were unsuccessful. Child was upset and "cried that her mom wasn't there." Tr. at 68.

[8] In August 2015, the trial court held a review hearing. DCS reported that Mother was using drugs again and had moved into a hotel. The trial court ordered Mother to submit to a drug screen, which came back positive for cocaine. *Id*. at 94. Mother told her family case manager that "she [] should just use drugs instead because everyone thinks that she's using and that she would be better off dead [] and that she was not going to submit to anymore [sic] drug screens after this point and she was done engaging in services." *Id*. Thereafter, Mother stopped communicating with DCS, participating in services, and attending visitation with Child.

[9] In October 2015, the trial court held a review hearing. Mother and Stepfather had obtained a divorce. Stepfather had filed an adoption petition, and Mother advised the trial court that she no longer desired reunification with Child. The trial court found that Stepfather was participating in some services as required by the PPP, but had not completed a psychological evaluation. The trial court adopted a new permanency plan for placement of Child in Stepfather's legal custody and a concurrent permanency plan for Stepfather's adoption of Child. Appellant's App. Vol. 2 at 55.

[10] In early 2016, DCS initiated a referral for intensive home-based therapy for Stepfather and Child to stabilize Child and work toward Stepfather's adoption of Child. The treatment plan for Child included coping with intense emotions and anxiety and grieving the loss of her mother. Appealed Order at 8. A therapist met with Stepfather and Child from April to August 2016, but Stepfather did not want to address Mother's absence from Child's life. The therapist observed that Stepfather was unable to set appropriate parenting boundaries with Child, and in nearly every session was unable to redirect Child's screaming and tantrums. *Id.*

[11] In April 2016, the trial court held a review hearing and found that although Stepfather was participating in services, there was some question as to whether he had benefited from the services provided, and he still had not completed a psychological evaluation. The trial court adopted a permanency plan calling for Child's adoption but did not identify adoptive parents and ordered that Child's placement continue with Stepfather. Appellant's App. Vol. 2 at 59. In June 2016, DCS filed a petition for involuntary termination of Mother's parental rights. *Id.* at 66-69.

[12] Between May and September 2016, Mother was charged with and pled guilty to numerous crimes. She was convicted of two counts of level 6 felony theft, class A misdemeanor criminal trespass, class B misdemeanor false reporting, and class A misdemeanor domestic battery. From August to October 2016, Mother was incarcerated.

[13]     In August 2016, the trial court held a review hearing and found that Child was not progressing under Stepfather's care, her behaviors were becoming increasingly more extreme, and the GAL, CASA, and service providers had significant concerns about whether Stepfather was able to meet Child's needs. The trial court ordered that Child be removed from Stepfather. DCS placed Child with pre-adoptive foster parents after a short stay at the Youth Services Center.

[14]     In October 2016, Mother was released from incarceration to home detention, and she moved into a one-bedroom apartment. She contacted DCS and attempted to resume services. She attended two visitations with Child in November 2016.

[15]     In October and November 2016, the trial court held a hearing on the termination of Mother's parental rights. The CASA testified that Child's behaviors had improved since she was placed in foster care and she was doing well both mentally and physically. Tr. at 132. The family case manager, the CASA, and the GAL all testified that termination was in Child's best interests. *Id*. at 127, 132, 141. In February 2017, the trial court issued the Termination Order with the following relevant conclusions:

> 3. The Court concludes that the reason for [Child's] placement outside of Mother's care [is] primarily due to [Child's] lack of

school attendance, Mother's struggle with mental health and substance abuse …[.][3]

4. At the time of the termination proceedings, Mother had not resolved her relapse into drug use. She had also failed to participate in and benefit from her individual therapy to assist her with her mental illness. Additionally, Mother [had] been convicted for domestic battery less than three months prior to the last day of trial in these proceedings. Mother had not maintained stable and safe housing as either her whereabouts were unknown or she was residing with [an] individual with whom she battered and for whom she blamed for her relapse. Mother's recent housing does not resolve the historical pattern of instability.

5. Moreover, Mother abandoned [Child] during the course of these proceedings (either through her conscience [sic] decision or symptomatic of her untreated mental illeness [sic]), choosing to drop out in an effort to have [Child] adopted or placed [in] the custody of [Stepfather]. Mother demonstrated no insight into the trauma and grief experienced by [Child] as a result of her abandonment.

6. Mother failed to avail herself of services to assist in the reunification with [Child]. Thus, for this and the reasons cited herein, she failed to remedy the reasons for [Child's] removal and the continued placement outside of her home.

---

[3] The trial court also included as a reason for Child's placement outside of Mother's care "domestic violence in the presence of [Child] with [Stepfather]." Appealed Order at 11. However, at the CHINS adjudication hearing, none of the parties admitted to any allegations that Mother and Stepfather were involved in domestic violence, and the Appealed Order contains no findings regarding whether there was domestic *violence* between Mother and Stepfather. The trial court did find that on or about the time of removal, Mother and Stepfather had engaged in "domestic altercations" in Child's presence. *Id.* at 2. In their briefs, neither Mother nor DCS addresses domestic violence as a reason for removal. Accordingly, to the extent the trial court's reference to domestic violence may constitute error, we consider it harmless.

7. The Court concludes that [Child] requires consistency and stability, Mother has been unable and unwilling to demonstrate an ability to provide these needs to [Child].

8. Termination must be in the child's best interests and the petitioner must have a satisfactory plan for the care and treatment of the child. IC 31-35-2-4 (b) (C) and (D) and IC 31-35-2-8. In this case the [GAL] and CASA have concluded that termination of parental rights is in [Child's] best interests. The Court concludes that the termination of parental rights and placement for adoption will provide [Child] with the nurturance care and protection she requires. It is therefore in her best interests that the petition to terminate parental rights be granted.

Appealed Order at 11 (brackets removed). Mother now appeals.

# Discussion and Decision

## Standard of Review

In appeals involving the termination of parental rights, we have long employed a highly deferential standard of review. *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 92 (Ind. Ct. App. 2014).

> When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. We consider only the evidence and reasonable inferences that are most favorable to the judgment. …. When reviewing findings of fact and conclusions of law entered in a case involving a termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. We will set aside the trial court's judgment only if it is clearly erroneous. A judgment is clearly erroneous if the findings

> do not support the trial court's conclusions or the conclusions do not support the judgment.

*In re G.Y.*, 904 N.E.2d 1257, 1260 (Ind. 2009) (citations, quotation marks, and brackets omitted). Here, Mother does not challenge the trial court's findings of fact, and therefore we will accept them as true. *See McMaster v. McMaster*, 681 N.E.2d 744, 747 (Ind. Ct. App. 1997) ("Father does not challenge these findings and we accept them as true.").

[17] We observe that "although parental rights are of a constitutional dimension, the law provides for the termination of these rights when the parents are unable or unwilling to meet their parental responsibilities." *In re A.P.*, 882 N.E.2d 799, 805 (Ind. Ct. App. 2008). Involuntary termination of parental rights is the most extreme sanction, and therefore "termination is intended as a last resort, available only when all other reasonable efforts have failed." *Id.*

[18] A petition to terminate a parent-child relationship involving a CHINS must allege, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services.

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).

[19] DCS must prove by "clear and convincing evidence" each element set forth in Section 31-35-2-4(b)(2). *G.Y.*, 904 N.E.2d at 1261; Ind. Code § 31-37-14-2. "'Clear and convincing evidence need not reveal that the continued custody of the parents is wholly inadequate for the child's very survival.'" *Id.* (quoting *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 148 (Ind. 2005)). "'Rather, it is sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody.'" *Id.* (quoting *Bester*, 839 N.E.2d at 148).

## Section 1 - The trial court did not clearly err in concluding that there is a reasonable probability that the conditions that resulted in Child's removal or the reasons for placement outside the home will not be remedied.

[20] Mother first challenges the trial court's conclusion that there is a reasonable probability that the conditions resulting in Child's removal or the reasons for placement outside the home would not be remedied. In reviewing this determination, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child*

*Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, "we must ascertain what conditions led to [her] placement and retention in foster care." *Id.* Second, "we 'determine whether there is a reasonable probability that those conditions will not be remedied.'" *Id.* (quoting *In re I.A.*, 934 N.E.2d 1127, 1134 (Ind. 2010)). When the trial court makes its determination, it must evaluate a parent's fitness at the time of the termination hearing, *taking into consideration evidence of changed conditions* and balancing a parent's recent improvements against "'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (quoting *K.T.K.*, 989 N.E.2d at 1231) (emphasis added).

[21] In this case, the primary reasons for Child's removal or placement outside Mother's care were Mother's mental health and substance abuse issues.[4] Mother contends that the trial court erred by failing to consider evidence of changed conditions. According to Mother, these changed conditions were established by the progress she made early in the case when she was fully participating in services. She points out that she successfully completed substance abuse counseling and parenting classes, submitted and passed all her random drug screens until August 2015, obtained appropriate housing and attended all scheduled visitation, and briefly participated in individual counseling.

---

[4] The trial court also noted that Child was missing school, but that seems to be a result of Mother's mental health and substance abuse issues.

[22] We note that although Mother initially participated in services, any "changed conditions" were short-lived. As for Mother's mental health issues, the trial court found that she suffers from mental illness for which she receives social security, but she did not benefit from individual therapy because she attended only four sessions, and, at the time of the termination hearing, she was not taking her prescribed medication and was not in treatment with any mental health service provider. Appealed Order at 7. As for Mother's substance abuse, the trial court found that although Mother completed substance abuse programs, she relapsed into drug use, and therefore she did not benefit from the treatment. *Id*. at 9.

[23] Mother attempts to excuse her cessation of services and failure to engage in visitation with Child after August 2015 by arguing that she was told by DCS that by divorcing Stepfather, Child's placement with him as a permanency plan would be expedited, which would "permit her to maintain her close loving and bonded relationship with [Child] when she elected to stop participating in services." Appellant's Br. at 16. We observe that between mid-July 2015 and May 2016, Mother did not have any visitation with Child. Child was upset and wept when Mother was not at her apartment for two scheduled visitations in July 2015. In May 2016, Mother had one two-hour visitation. Mother cancelled the next scheduled visit. When the trial court began the termination hearings in October 2016, Mother had visited with Child only once in fourteen months. The lack of contact does not reflect any desire on Mother's part to maintain a close, loving relationship with Child. The undisputed findings show

that in August 2015, Mother expressed her intention to stop participating in services to her family case manager. Appealed Order at 10; Tr. at 94. In October 2015, Mother advised the trial court that she did not intend to work toward reunification. Appealed Order at 5. Although Child required therapy to help her deal with feelings of anxiety and grief from losing her Mother, the trial court found, "Mother demonstrated no insight into the trauma and grief" experienced by Child because of Mother's abandonment. *Id.* at 11.

[24] In addition to Mother's failure to treat her mental illness, benefit from substance abuse treatment, and maintain a relationship with Child, she failed to maintain proper housing for herself. She also failed to refrain from criminal activity and was convicted of two felonies and three misdemeanors shortly before the termination hearing. Mother argues that at the time of the termination hearing, she had reestablished appropriate housing and recommenced services. However, a trial court is within its discretion to give less weight to efforts made shortly before termination and to weigh more heavily the history of conduct prior to those efforts. *K.T.K.*, 989 N.E.2d at 1234. Therefore, the trial court did not clearly err in concluding that there is a reasonable probability that the conditions that resulted in Child's removal or the reasons for placement outside the home will not be remedied.

# Section 2 – The trial court did not clearly err in concluding that termination of Mother's parental rights is in Child's best interests.

[25] Mother challenges the trial court's conclusion that termination of the parent-child relationship is in Child's best interests.

> [I]n determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the Department of Child Services and to consider the totality of the evidence. In so doing, the trial court must subordinate the interests of the parent to those of the child. The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. Moreover, we have previously held that the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests.

*In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009) (citations omitted); *see also In re L.S.*, 717 N.E.2d 204, 210 (Ind. Ct. App. 1999) ("[C]hildren should not be compelled to suffer emotional injury, psychological adjustments, and instability to preserve parental rights."), *trans. denied* (2000), *cert. denied* (2002).

[26] Mother argues that based on the totality of the evidence termination is not in Child's best interests. Mother maintains that she provided for all Child's needs until the underlying CHINS proceedings were initiated, and she poses no safety concern to Child and was observed to be good at handling Child's behavioral problems and tantrums. She again directs our attention to her early

participation in services and emphasizes that as soon as she was released from incarceration, she reestablished appropriate housing and recommenced services. She likens this case to *In re R.H.*, 892 N.E.2d 144 (Ind. Ct. App. 2008), in which another panel of this Court reversed a termination order.

In that case, R.H.'s father, Sean, moved to Alaska when R.H. was three months old. A few months later, R.H. and his mother moved to Alaska but returned to Indiana after eight months. Due to mother's drug use, R.H. was adjudicated a CHINS and was placed with his paternal grandmother and her husband. Although Sean did not move back to Indiana as DCS urged, he completed all court-ordered services in Alaska. However, he did not have contact with R.H. for two years, and DCS filed a petition for involuntary termination of his parental rights. The trial court granted the petition because Sean had not made sufficient efforts to communicate and bond with R.H., Sean refused to move back to Indiana, and R.H. would be traumatized if forced to leave his grandparents with whom he was strongly bonded.

The *R.H.* court concluded that Sean had completed all services and, now that he realized that his parental rights could be terminated, was making great efforts to establish a bond with R.H., and R.H. could continue to live with his grandparents, who provided a safe and stable environment, while Sean worked to develop a relationship with him. *Id*. at 150-51. The *R.H.* court summed up as follows:

> [W]e find that although evidence of Sean's lackluster efforts to
> communicate and visit with R.H., Sean's refusal to relocate to

Indiana, and R.H.'s strong bond with his grandparents would be relevant to a determination of custody and/or guardianship, it is insufficient on its own to support the radical act of severing the parent-child relationship.

*Id*. at 151.

[29] *R.H.* is clearly distinguishable from this case. Mother did not comply with the PPP or complete all court-ordered services; she totally disengaged from services, stopped communicating with DCS, and abandoned all contact with Child. Also, in *R.H.*, the child was placed with his paternal grandparents, who provided a safe and stable home. Child's placement with Stepfather is not comparable. As of August 2016, DCS, the CASA, and the GAL were concerned that Stepfather was unable to meet Child's needs. Child's therapist observed that Stepfather had difficulty handling her screaming and tantrums. Appealed Order at 8. Child was removed from Stepfather because Stepfather admitted to removing her from her medication without the advice of her physician, was planning to homeschool her without DCS's permission, and was planning to move to Muncie to get married, and DCS, the CASA, and the GAL were concerned that Stepfather did not have the ability to control Child's erratic behaviors. *Id*. at 9.

[30] We further observe that the family case manager, the CASA, and the GAL opined that termination was in Child's best interests. Child has been placed with a pre-adoptive family and is doing well both mentally and physically, and her behavior has improved. Accordingly, the trial court did not clearly err in

concluding that termination of Mother's parental rights is in Child's best interests.

## Section 3 – The trial court did not clearly err in concluding that adoption is a satisfactory plan for Child's care and treatment.

[31]    Finally, Mother insists that adoption is not a satisfactory plan because Child was already eleven years old at the time of the termination hearing and has behavioral problems, and therefore the prospect of adoption by persons other than Stepfather is problematic and difficult. We observe that

> Indiana courts have traditionally held that for a plan to be satisfactory, for the purposes of the termination statute, it need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. A DCS plan is satisfactory if the plan is to attempt to find suitable parents to adopt the children. In other words, there need not be a guarantee that a suitable adoption will take place, only that DCS will attempt to find a suitable adoptive parent. Accordingly, a plan is not unsatisfactory if DCS has not identified a specific family to adopt the children. Part of the reason for this is that it is within the authority of the adoption court, not the termination court, to determine whether an adoptive placement is appropriate.

*In re A.S.*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014) (citations and quotation marks omitted), *trans. denied*.

[32]    Our case law establishes that adoption is a satisfactory plan for a child's care and treatment. Here, DCS's plan is for Child's adoption, and there is nothing

in the record that suggests that adoption for this particular child is inappropriate. Mother's preference for Stepfather's adoption of Child does not render DCS's plan for adoption unsatisfactory. We find no error here.

[33] Based on the foregoing, we affirm the trial court's termination of Mother's parental rights to Child.

[34] Affirmed.

Vaidik, C.J., and Mathias, J., concur.